IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 9, 2014 at Knoxville

## STATE OF TENNESSEE v. ALLEN CORNELIUS BOND

**Appeal from the Criminal Court for Madison County**
**No. 12-555     Roy B. Morgan, Jr., Judge**

_____

**No. W2014-00069-CCA-R3-CD  - Filed March 27, 2015**

_____

The defendant, Allen Cornelius Bond, was convicted by a Madison County Criminal Court jury of aggravated sexual battery, a Class B felony, and attempted sexual battery, a Class A misdemeanor, and was sentenced to an effective term of sixteen years in the Tennessee Department of Correction to be served consecutively to a prior sentence.  On appeal, he argues that:  (1) his right to an impartial jury was violated because one of the jurors knew him; (2) the evidence is insufficient to sustain his convictions; (3) the trial court erred in allowing the nurse examiner to testify as an expert witness; and (4) the trial court erred in not exercising its authority as the thirteenth juror and setting aside his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., joined.  TIMOTHY L. EASTER, J., concurred in results only.

Christie Hopper, Jackson, Tennessee (on appeal); and Jeremy B. Epperson, Assistant Public Defender (at trial), for the appellant, Allen Cornelius Bond.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

### Trial

On the night of May 18, 2012, two sisters, "younger victim" and "older victim," were touched sexually by the defendant, a cousin of the boyfriend of the victims' mother. As a result, the defendant was indicted for the child rape and attempted child rape of the younger victim, and the aggravated sexual battery and attempted sexual battery of the older victim. Before trial, the State dismissed the attempted child rape and aggravated sexual battery charges, and the defendant proceeded to trial on the remaining two charges.

At trial, the younger victim, who was eight years old at the time of the incident, testified that in May 2012 she lived with her mother, twin brother, older sister, younger sister, and her mother's friend, Ken Bass. She had know Bass since she was three years old. The younger victim identified the defendant as "Tojo," and explained that she had known him "[f]or a long time" as he is Bass's first cousin.

The younger victim recalled a night in May 2012 when they had some friends, K.J. and K.C.,[1] over for a sleepover. The group was in the living room, watching a scary movie on TV. There were two couches in the living room. The younger victim slept on the smaller couch, and the older victim, K.J., and K.C. slept on the larger couch. The younger victim did not have her own bedroom, so she always slept on the small couch with covers as if it were her bed. The younger victim recalled that she was wearing pajama pants, an undershirt, and underwear that evening. She stayed awake "[k]ind of" late and eventually fell asleep.

The younger victim testified that at some point during the night, she awoke to the defendant touching her "middle part" between her legs under her clothes. The defendant had pulled her clothes "[h]alfway down." The defendant used his finger to touch both the inside and outside of the younger victim's private part, which she described as feeling "[u]ncomfortable." The defendant also tried to "put his private into [her] behind." The younger victim did not say anything to the defendant because she was scared. The touching went on for "[a] little while," but the defendant stopped when the younger victim's brother woke up.

The younger victim testified that she told her mother what had happened once the defendant left the house. When she went to the bathroom, she noticed some blood. She showered and changed clothes and underwear, then sometime later she went to the hospital for an examination. On cross-examination, the younger victim acknowledged that she previously told someone that the defendant only touched her on top of her clothes.

Mary Jane Cole, a sexual assault nurse examiner with Jackson General Hospital in Jackson, Tennessee, testified as an expert in sexual assault forensic nursing that she

---

[1] We refer to minors by their initials.

interviewed and examined the victim on May 18, 2012. It was her understanding that the sexual assault occurred around the same date that she conducted the examination. Her examination did not reveal any injury to the victim's genitalia or anal area, but she noted that "[o]nly about 4 percent of the prepubescent population will demonstrate acute injury to the genitalia."

Nurse Cole testified that the younger victim was "very quiet" and "did not engage in conversation with [her]." When she questioned the younger victim if any part of her body hurt, she said that her "behind" hurt. Nurse Cole recalled that the younger victim shook her head negatively when asked if she had told anyone about the incident, but the nurse was unsure whether the younger victim understood the question. The younger victim indicated to the nurse that she was wearing the same clothing and underwear that she had been wearing during the incident. When asked if she had urinated or defecated recently, the younger victim indicated that she had urinated and had wiped her genitalia with toilet tissue. The younger victim's mother informed Nurse Cole that the younger victim had noticed blood when she went to the bathroom. Nurse Cole stated that "there was some confusion" relating to when the younger victim bathed or showered, but it was Cole's understanding that the younger victim last bathed around 9:30 p.m. which was prior to the incident.

Nurse Cole testified that she swabbed the outer area of the younger victim's labia majora, the border of her buttocks, and the external portion of her anus. She also collected the younger victim's underwear. She noted the crotch of the younger victim's underwear was soiled with a brownish coloring, but not bright blood. Nurse Cole stated that there was a very low likelihood that any of the perpetrator's DNA would be present when the assault involved digital penetration, particularly when the victim's genitalia had been wiped after urination.

The older victim, who was thirteen years old at the time of trial, testified that on May 18, 2012, she had her friends, K.J. and K.C., over for a sleepover. The older victim, younger victim, their brother, K.J., and K.C. watched TV in the living room together. They watched "[s]omething on the Disney Channel" and never watched a scary movie that evening. The younger victim sat on the "couch chair" with a cover, and the older victim and her friends sat on the larger couch. At some point that night, the younger victim fell asleep on the "couch chair."

The older victim testified that the defendant was Ken Bass's cousin and that she had known him for as long as she had known Bass, approximately five years. She knew the defendant as "Tojo." On the night of the sleepover, the older victim saw the defendant enter the house and sit down on the arm of the younger victim's chair. The TV and lights were on, and everyone except the younger victim was awake. The older victim saw the defendant "rubbing" or moving his hand under the younger victim's cover for about five minutes. The

younger victim woke up after the defendant left the room and then went back to sleep. The older victim did not tell anyone what she had witnessed because she was scared.

The older victim testified that the defendant returned to her house again that night around 2:00 or 3:00 a.m. He walked into the living room, turned on the light, and asked the older victim if she was asleep. The older victim responded, "Not anymore," and the defendant turned off the light and sat in the computer chair. The older victim testified that the defendant rubbed on the top of her thigh, and she asked, "What you doing[?]" The defendant said to her, "Come here," and she responded, "No." The defendant stopped touching her and left the house. After the defendant left, the older victim told her mother what had happened, and her mother called the police.

On cross-examination, the older victim was questioned about her testimony at a previous hearing in city court. Defense counsel asked the older victim if she remembered saying that the defendant touched her leg but did not mention her thigh. The older victim responded that her thigh is part of her leg. Defense counsel also asked the older victim about her testimony at another previous hearing. The older victim acknowledged that, at that hearing, she said that the defendant "started [touching her] like in [her] feet and was coming up" and stopped above her knee. The older victim clarified, "And that's on my thigh, above my knee." Asked if she remembered telling a woman named Monica Goodman at the Carl Perkins Center that the defendant touched her around the knee area, the older victim said that she did not remember saying that but would not disagree with Goodman if that was what Goodman recalled.

K.J., who was twelve years old at the time of trial, testified that she lived near and went to school with the older victim. One night in May 2012, K.J. went to the victims' house for a sleepover. That night, K.J., the victims, the victims' brother, and another friend, K.C., watched the Disney Channel on the TV in the living room. They never watched a scary movie that evening. K.J., K.C., and the older victim sat on one couch, while the younger victim sat on another chair or couch.

K.J. testified that, at one point during the night, she saw the defendant sit on the arm of the chair where the younger victim was sleeping and put his hand under her cover. However, K.J. could not see what the defendant was doing under the cover. The defendant eventually stopped and left the house. K.J. did not tell anyone what she had observed because she was scared. K.J. fell asleep but was later awoken by the older victim. K.J. learned from the older victim that the defendant had returned to the house while K.J. had been asleep.

-4-

On cross-examination, defense counsel questioned K.J. about a statement she gave to a police officer regarding the night in question. K.J. admitted that she indicated in her statement that after she saw the defendant put his hand under the younger victim's blanket, she and the older victim went and told the victims' mother. She also admitted that she indicated in her statement that they went and told the victims' mother two different times. However, K.J. said that what was in the statement was wrong; they only spoke to the victims' mother after the defendant left the second time. K.J. acknowledged that she did not tell the police officer the truth. However, on redirect examination, K.J. said that she was just "mixed-up" and did not intentionally lie to the officer.

K.C., who was fourteen years old at the time of trial, testified that she lived near the older victim at the time of the incident. On May 18, 2012, K.C. went to the older victim's house for a sleepover. They were in the living room watching the Disney Channel on the TV. At one point during the evening, the defendant entered the house, walked into the living room, and sat on the arm of the big chair on which the younger victim was sleeping. K.C. saw the defendant's "hand up under the [younger victim's] blanket touching her." K.C. said that the incident did not go on "too long" and that the defendant eventually left. K.C. told the older victim and K.J. what she had seen. K.C. was scared, so she left the victims' house and returned to her own home. K.C. did not inform her parents of what she had witnessed at the victims' house. On cross-examination, K.C. acknowledged that she could not see underneath the younger victim's blanket.

Following the conclusion of the proof, the jury convicted the defendant of the lesser included offense of aggravated sexual battery against the younger victim and, as charged, of attempted sexual battery against the older victim.

**Motion for New Trial**

Francis Lynn Greer, who served as a juror on the defendant's trial, testified that she told the court during voir dire that she did not know the defendant, a response she gave because "he did not look familiar to [her]." She did not have any recollection of the defendant until she received a subpoena from the defendant's attorney sometime after the case was over, and she asked the attorney why she had been subpoenaed. The attorney informed her that she was subpoenaed because, "You all grew up together in Denmark[, Tennessee]." Greer thought, "[Y]es, I did live in Denmark, and, yes, there is a chance that I know him, but none of that played a factor as I sat in that chair that particular day on that case."

Greer testified that her family moved to Denmark in 1992, and she hated living in the country. She moved away after she graduated from high school in 1997. While living in

Denmark, Greer said that she "stayed in the house" and "didn't have friends." She said that the people with whom she attended high school were only "associates; they were not friends; they did not come to my house; they didn't know my parents." When asked if "everybody knows everybody" in Denmark, Greer responded, "We didn't because we moved out there in [19]92. I hated the country, didn't want to move out in the country. It was my parent's decision, and as soon as I was able to leave the country, I did."

Greer testified that she "can't even say" that she had ever met the defendant. She did not recall if she had ever spoken to the defendant in Denmark, because "[t]hat was 15 something years ago." She reiterated that the defendant did not look familiar to her when he stood up at trial. When asked if the defendant did not look familiar to her because he had grown older, Greer responded, "[N]o. . . . [A] face is a face." She elaborated, "If I ran into him in the store and he said hi and I said hi, it might have been, 'How do we know each other?' It wouldn't have been like, 'Oh, hey, I remember you from Denmark.' It wouldn't have been nothing like that."

Greer testified that, when the defendant's attorney asked if she knew the defendant using his legal name, she responded, "Yeah, a bunch of Bonds live in Denmark, . . . but I do not recognize . . . him." When the attorney mentioned the name "Tojo," Greer responded, "[T]hat sounds familiar, . . . but I still do not remember him." Greer recalled that she had heard of the defendant's nickname, "Tojo," through Keisha Bond,[2] whom Greer used to speak with on the school bus. Greer believed that Keisha was related to the defendant in "some kind of way" because they had the same last name. Greer said that "pretty much everybody [in Denmark] is related except for [her family]."

Greer recalled that Keisha lived up the road from her and was her "closest acquaintance" during her time in Denmark. However, Greer never visited Keisha, and Keisha never visited Greer. Greer stated:

> I stayed in the house. I was sheltered. For one, I didn't like being in the country, period. I don't like bugs, the smell of cows, the smell of pigs, and all of that is out there in the country. I did not like being in the country at all, so I didn't have a social life. I stayed at my house, and I didn't allow friends to come to my house.

Lakesha Transou, the defendant's first cousin, testified that she was originally from Denmark where she had lived for thirty-three years. Transou stated that she and Juror Greer were friends when Greer lived in Denmark, and they lived seven houses from each other

---

[2] To prevent confusion, we will refer to individuals with the surname "Bond" by their first name.

during that time. Transou stated that the defendant did not attend high school in Denmark because he lived in Cleveland, Ohio, during the school year. However, the defendant visited Denmark each summer, where he hung out with his family and neighbors. Transou explained that everyone in that neighborhood was "more or less family." She had seen the defendant and Greer in each other's presence on an occasion and recalled a time when the defendant and one of his cousins "got into it about [Greer]." However, Transou did not witness the alleged fight.

Transou acknowledged that the defendant called and asked that she speak with his lawyer. Transou called the defendant's lawyer's office and spoke to the receptionist. She wanted "to let [the lawyer] know that I did know Ms. Francis Davis Greer, that she was from Denmark and that she would know [the defendant], maybe not by Cornelius but he looks the same." A few days later, Transou received a subpoena for court.

Transou claimed that, sometime after the trial, she saw Greer at the store where Greer worked, and they had a conversation. Transou recalled that Greer told her "that she was a juror, and she said that she didn't know [the defendant] by his name and she didn't remember him. . . . She said she didn't pay his name no attention." However, Transou believed that Greer should have remembered the defendant because "[h]e looks the same." Transou expressed, "I know [Greer], she knows me, she knows my whole entire family."

Antonio Bond, the defendant's thirty-seven-year-old first cousin, testified that he had lived in Denmark his entire life. Antonio said that, growing up, the defendant lived in Ohio and visited Denmark for two and a half to three months each summer from the time he was around five years old. Antonio stated that he knew Greer because her family moved into his neighborhood when he was around eleven years old. Greer's house was directly across the street from Antonio's grandmother's house, where the defendant would visit when he came to town. Antonio stated that "[e]verybody knows everybody" in his neighborhood, and everybody in the neighborhood "hung out" at his grandmother's house every day of the summer. He had seen the defendant hanging out with Greer, but not every day.

The defendant's lawyer at trial, "counsel," testified that two or three weeks after the jury verdict, the defendant sent him a letter, dated March 29, 2013, indicating that Greer was a family friend of one of his relatives. In the letter, the defendant stated that Greer lived next door to the defendant's uncle's house and that the defendant's "frequent visits to his [uncle's] house has made Francis Greer and myself familiar with each other." The defendant claimed that "he knew who she was and that he thinks that she knew him." Counsel stated that he did not know this information during voir dire or trial, and he raised the issue for the first time in his motion for new trial.

The defendant testified that, after the trial, right after the jury read the verdict and he was walking out of the courtroom, he informed counsel, "That juror, she knows me." The defendant claimed that counsel responded, "We'll handle that at a little later time." The defendant stated that he then had some of his family members and his fiancée call counsel and, when he did not hear a response from counsel, he wrote counsel a letter concerning the juror issue.

The defendant testified that he knew Greer from when they were young and played together in the summer. He stated that "we all had crushes on [Greer] 'cause from all of us being around there." However, he did not remember an incident of fighting over her. The defendant admitted that he did not recognize Greer during jury selection, trial, or the reading of the verdict. He elaborated that her name sounded familiar, and she "looked kinda familiar, but I just really couldn't put my hand on it until afterwards."

## ANALYSIS

### I. Impartial Jury

The defendant argues that his right to an impartial jury was violated because one of the jurors knew him and "still participated in jury deliberations leading to extraneous information being taken into jury deliberations."

A defendant is entitled to a trial "by an impartial jury," with the jurors "render[ing] their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." U.S. Const. amend. VI; Tenn. Const. art. I § 9; see also State v. Adams, 405 S.W.3d 641, 650 (Tenn. 2013). An impartial jury is one in which the jurors are "'free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). Inquiry into a jury's deliberative process is limited by Tennessee Rule of Evidence 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may

-8-

a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b).

The defendant carries the burden of establishing that a juror bias challenge may be maintained and of establishing a prima facie case of bias. See State v. Robinson, 146 S.W.3d 469, 523 (Tenn. 2004); Akins, 867 S.W.2d at 355.

As outlined above, the trial court conducted a hearing on the defendant's motion for new trial at which Juror Francis Greer, the defendant, and two of the defendant's cousins testified concerning the juror's potential familiarity with the defendant. In ruling on the motion, the trial court accredited Greer's testimony that she did not recognize the defendant or have any recollection of him until she was contacted to testify at the motion for new trial hearing. The court noted that the defendant, himself, did not recognize Greer until after the trial. The court found that there was not "a scintilla of proof that [Greer] was biased or partial in some manner . . . [and] no evidence that she in any manner brought any extraneous evidence or information into the jury room or into the deliberation of this jury."

The testimony of the defendant and his cousins established that the defendant did not attend high school or live in Tennessee; he visited Denmark in the summer and stayed at his grandmother's house across the street from Greer's house. One cousin, Lakesha Transou, testified that Greer should have remembered the defendant because "[h]e looks the same." Another cousin, Antonio Bond, claimed that "[e]verybody knows everybody" in his neighborhood, and everybody in the neighborhood "hung out" at his grandmother's house every day of the summer. He said that he had seen the defendant hanging out with Greer, but not every day. Transou remembered having seen the defendant and Greer in each other's presence on an occasion and recalled a time when the defendant and one of his cousins "got into it about [Greer]." However, Transou did not witness the alleged fight, and the defendant did not recall getting into a fight over Greer. The defendant admitted that he did not recognize Greer during jury selection, trial, or the reading of the verdict. He said that her name sounded familiar, and she "looked kinda familiar, but [he] just really couldn't put [his] hand on it until afterwards." It was not until after trial that he and members of his family recognized Greer. This testimony simply fails to offer any proof of bias on Greer's part.

Greer testified that she did not have any recollection of the defendant until she received a subpoena from the defendant's attorney sometime after the case was over, and she inquired as to why she had been subpoenaed. Greer did not recognize the defendant's legal name, but when the attorney mentioned the name "Tojo," Greer responded, "[T]hat sounds

familiar, . . . but I still do not remember him." Greer recalled that she had heard of the defendant's nickname, "Tojo," through Keisha Bond, an acquaintance of Greer's from riding the school bus together in Denmark. Greer said that she hated living in Denmark and that she "stayed in the house" and "didn't have friends" there. Greer testified that she "can't even say" that she had ever met the defendant, and she did not recall if she had ever spoken to the defendant in Denmark, because "[t]hat was 15 something years ago." She reiterated that the defendant did not look familiar to her when he stood up at trial. Greer summarized, "[Y]es, I did live in Denmark, and, yes, there is a chance that I know him, but none of that played a factor as I sat in that chair that particular day on that case."

After review of Greer's testimony and the testimony of the defendant and his cousins, we conclude that the evidence supports the trial court's determination that the defendant failed to show that Greer was biased in any way, or that he was denied the right to trial by an impartial jury.

## II. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence convicting him of aggravated sexual battery against the younger victim and attempted sexual battery against the older victim.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370,

380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know . . . that the victim did not consent[.]" Id. § 39-13-505(a)(2). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense":

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and

believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

With regard to his conviction for aggravated sexual battery against the younger victim, the defendant argues that the proof is insufficient because there was no proof of physical injury, no witnesses who saw what the defendant's hand was doing under the younger victim's cover, and there were inconsistencies in the testimony of the various witnesses – such as whether the TV was on, what the witnesses were watching on TV, and when the victims' mother was informed of what happened.

At trial, the younger victim testified that while she was sleeping in a chair, she awoke to the defendant touching the inside and outside of her "middle part" between her legs with his finger. The defendant had pulled her clothes "[h]alfway down." The younger victim's testimony was corroborated by her sister and friends who were present in the living room when the defendant committed the crime. The older victim testified that she saw the defendant enter the house and sit down on the arm of the chair on which the younger victim was sleeping. She saw the defendant "rubbing" or moving his hand under the younger victim's cover for about five minutes. K.J. testified that she saw the defendant sit on the arm of the chair where the younger victim was sleeping and put his hand under her cover, but she could not see what the defendant was doing under the cover. K.C. testified that she saw the defendant sit on the arm of the big chair on which the younger victim was sleeping, and the defendant's "hand up under the [younger victim's] blanket touching her."

Proof of physical injury is not a required element under the statute, and the nurse who examined the younger victim testified that "[o]nly about 4 percent of the prepubescent population will demonstrate acute injury to the genitalia." Even so, the younger victim's mother informed the nurse examiner that the younger victim had noticed blood when she went to the bathroom, and the nurse noticed that the crotch of the younger victim's underwear was soiled with a brownish coloring.

We conclude that the testimony of the witnesses established the requisite elements of the offense and the defendant's identity as the perpetrator. Any inconsistencies in the witnesses' testimony were resolved by the jury as the trier of fact. The evidence is sufficient

for a rational trier of fact to find the defendant guilty of aggravated sexual battery against the younger victim.

With regard to his conviction for attempted sexual battery against the older victim, the defendant argues that the evidence is insufficient because the older victim's testimony was inconsistent as to where exactly on her leg he touched her. However, viewed in the light most favorable to the State, there is sufficient evidence for a rational trier of fact to find the defendant guilty of attempted sexual battery against the older victim. The older victim testified that, on the night of the sleepover, the defendant returned to her house a second time, around 2:00 or 3:00 a.m. He walked into the living room, turned on the light, and asked the older victim if she was asleep. The older victim responded, "Not anymore," and the defendant turned off the light and sat in the computer chair. The older victim testified that the defendant rubbed on the top of her thigh, and she asked, "What you doing[?]" The defendant said to her, "Come here," and she responded, "No." The defendant stopped touching her and left the house. In addition, K.J., who was sleeping on the same couch as the older victim, testified that she was awoken by the older victim after the defendant left the house, and the older victim informed her that the defendant had returned to the house while K.J. had been asleep.

The defendant points to his questions to the older victim on cross-examination concerning different accounts of where the older victim said he touched her on her leg, compared to her testimony at trial. However, the older victim's testimony was heard and assessed by the jury, as the trier of fact, whose determination we will not second-guess.

### III. Expert Witness

The defendant argues that the trial court erred in allowing Nurse Cole to testify as an expert witness "because she is not a doctor or nurse practitioner vested with authority to make a diagnosis as to whether or not sexual assault occurred."

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] (4th ed. 2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id. The

determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997). As such, we will not disturb the trial court's ruling absent a clear showing that it abused its discretion in admitting the testimony. Id.; Stevens, 78 S.W.3d at 832.

In ruling on this issue at the motion for new trial, the trial court found:

The expert was duly questioned and presented her credentials as required. Trial counsel . . . was provided her curriculum vitae prior to her coming to Court and reviewed the medical records. This witness testified under oath as to her education and experiences; all the things that were necessary for the witness to testify as an expert. The Court followed the guidelines as set forth under the rules to allow expert testimony. There has been no proof offered today that this witness lied under oath or that she was not employed as she testified or in any manner lacked the qualifications that she stated under oath that she possessed. The matter of her testimony was submitted to the jury under the appropriate instruction regarding the testimony of an expert witness, the jury heard her testimony as to her qualifications and were appropriately instructed that it was in the discretion of the jury as to the weight and credibility to assign to her testimony. This issue is overruled.

The defendant asserts that it was improper for Nurse Cole to testify as an expert because she was not qualified to make a medical diagnosis given that she was not a doctor or nurse practitioner. However, we conclude that the trial court did not abuse its discretion in allowing Cole to testify as an expert witness. The voir dire of Cole concerning her qualifications reveals that she is a sexual assault nurse examiner with Jackson General Hospital, responsible for interviewing children who are alleged victims of sexual assault and physical abuse. She has a Master's degree in Nursing with a speciality in Advanced Forensic Nursing from the University of Washington, a Nursing diploma from Memphis Baptist School of Nursing, and a Bachelor's degree from Seattle Pacific University. She has worked in nursing for over forty-three years and has at least fifteen years' experience examining children and adults for sexual assault, including performing acute emergency examinations, as well as conducting or assisting with "a couple of thousand" forensic examinations. Cole's training and experience indicate a level of expertise beyond the scope of that of the average person, authorizing her to give an informed opinion on the subject at issue.

-14-

Moreover, even if the trial court committed any error in allowing Cole to testify as an expert witness, such error was harmless. The defendant admits that Cole's testimony could be considered "helpful" to his case in that she testified that she found no evidence of physical injury. As the trial court stated at the motion for new trial hearing:

> [W]hat's really ironic about this . . . [is] that this expert witness found no physical damage, no physical injury to substantiate the claim of the State against the [d]efendant. So, in fact, this expert witness that was allowed to testify was in somewhat favor of the [d]efendant in her testimony in that there were no findings that would substantiate an injury resulting from anything.

Accordingly, the defendant has failed to show any error on the trial court's part that "more probably than not affected the judgment or would result in prejudice to the judicial process." See Tenn. R. App. P. 36(b).

## IV. Thirteenth Juror

The defendant lastly argues that the trial court erred by "refusing to exercise its authority as the thirteenth juror and set aside [his] convictions" or grant his motion for new trial because the jury's verdict is contrary to the weight of the evidence, as well as because of the juror issue and expert witness issues addressed separately above.

Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule imposes a mandatory duty on the trial judge to act as the thirteenth juror in every criminal case. See State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). The rule requires that the trial judge be personally satisfied with the verdict, see State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995), and its purpose is "to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Price, 46 S.W.3d 785, 823 (Tenn. Crim. App. 2000) (quoting State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995)). The trial court does not have to make an explicit statement on the record. Moats, 906 S.W.2d at 434. Instead this court may presume by the trial court's overruling of the motion for new trial that it approved of the jury's verdict. Id. If, however, "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror[,]" the reviewing court may reverse the trial court's judgment. Carter, 896 S.W.2d at 122.

The defendant has failed to show any instances in the record where the trial court disagreed with the jury's verdict or the weight of the evidence. In fact, the court specifically

stated at the motion for new trial hearing and in the written order that the evidence is sufficient to support the jury's verdict. The mere fact that the trial court approved the jury's verdict, which was adverse to the defendant, does not mean that the trial court failed to fulfill its duty as the thirteenth juror. Moreover, the defendant's allegations that the trial court failed to fulfill its duty as the thirteenth juror because of the juror issue and expert witness issue are likewise without merit, as we have addressed those issues separately above and determined that there was no error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE